CHARLES WILLS and WILLIAM CONLEY, plaintiffs in error, *v.* THE PEOPLE, defendants in error.

Form of an indictment for feloniously receiving and having stolen property, with counts charging some of the defendants as accessories.

On the trial of an indictment for feloniously receiving and having stolen goods, where a witness called by the prosecution had testified that he called on the defendants and found the stolen property in their possession, and purchased it of them for a much less sum than its value, and had, at the time, in his possession, a memorandum of the goods which had been stolen, it is competent for the prosecution, for the purpose of showing the true position of the witness in the transaction, to show by him that he had previously received the memorandum from the person from whom the property had been stolen, and that he also got the money with which he bought the property from the person from whom it had been stolen.

What facts and circumstances are sufficient to justify the court in refusing to discharge one of the defendants, on the trial of such an indictment, where a clear case of guilt was made out against the other defendant, both being claimed to have acted in concert, stated in the history of the case, and commented on by MITCHELL, J.

Where the bulk of the stolen goods was found, in Williamsburgh, in a house apparently kept for storing and concealing goods, but a portion of the goods, used as samples, was found at the store and place of business of the defendants in New-York, at which place Wills, one of the defendants, exhibited to a witness, and offered to sell him, the whole of the goods, and the samples, before they were exhibited to the witness, were brought in by Conley, another defendant, after an absence of only fifteen minutes from the time he was sent by Wills to get them, it was held, on the trial of an indictment found in the city of New-York, that the Court of General Sessions were right in overruling a motion to dismiss the case, or to direct the jury to acquit the prisoners, which motion was made on the ground that it was not shown that they had received or had the goods in question, within the city and county of New-York.

On the trial of an indictment for receiving stolen goods, knowing them to be stolen, it is not competent for the defendant, for the purpose of proving that when he received the goods he had no knowledge of their being stolen, to prove what the person from whom he received the goods said as to the manner in which such person became possessed of the property.

Where a witness on the part of the prosecution had been asked, on his cross-examination, if one of the defendants had not made a certain remark to him, or in his hearing, and at a certain time and place, and had testified

that he had not, it is not competent for such defendant to prove, by another witness, that he, the defendant, did make such remark at the time and place in question. What such defendant had said was immaterial and incompetent, and could not be made competent, even for the purpose of impeachment, by the fact that the witness for the prosecution had denied it.

Where a witness, called by the defendants, testified that he saw in the store of the defendants samples of the property alleged to have been stolen, it is not competent for the defendants to prove by the witness what was said by one of the defendants then present " as to what the property was doing there."

Under the statute of this state, a person may be tried and convicted of the offence of feloniously receiving and having stolen goods, either in the county where the prisoner originally received the stolen property or in any county in which he afterwards had it.

THIS was a writ of error to the Court of General Sessions of the city and county of New-York. The defendants, with one Wilson, were indicted for feloniously receiving and having stolen property, with counts against some of them as accessories. The indictment was as follows:

*City and County of New-York, ss:*

The jurors of the people of the State of New-York, in and for the body of the city and county of New-York, upon their oath, present:

That Charles Wills, late of the first ward of the city of New-York, in the county of New-York, aforesaid, William Conley, late of the same place, and James R. Wilson, late of the same place, on the fifth day of January, in the year of our Lord one thousand eight hundred and fifty-six, with force and arms, at the ward, city and county aforesaid: fifty veils of the value of five dollars each, fifty shirts of the value of five dollars each, fifty collars of the value of five dollars each, fifty pieces of edging of the value of five dollars each, fifty pieces of inserting of the value of five dollars each, fifty robes of the value of five dollars each, and fifty waists of the value of five dollars each, of the goods and chattels of Aaron G. Crane, by some person to the jurors aforesaid unknown, then lately before feloniously

Wills and Conley *v.* The People.

stolen of the said Aaron G. Crane, unlawfully, unjustly and for the sake of wicked gain, did feloniously receive and have; the said Charles Wills, William Conley and James R. Wilson then and there well knowing the said goods and chattels to have been feloniously stolen, against the form of the statute in such case made and provided, and against the peace of the people of the State of New-York and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present: That afterwards, to wit, on the day and in the year last aforesaid, the said Charles Wills, late of the ward, city and county aforesaid, with force and arms at the ward, city and county aforesaid, fifty veils of the value of five dollars each, fifty shirts of the value of five dollars each, fifty collars of the value of five dollars each, fifty pieces of edging of the value of five dollars each, fifty pieces of inserting of the value of five dollars each, fifty robes of the value of five dollars each, fifty waists of the value of five dollars each, of the goods and chattels of one Aaron G. Crane, by some person to the jurors aforesaid unknown, then lately before feloniously stolen of the said Aaron G. Crane, unlawfully, unjustly and for the sake of wicked gain, did feloniously and willfully receive and have; the said Charles Wills then and there well knowing the said goods and chattels to have been feloniously stolen.

And the jurors aforesaid, upon their oath aforesaid, do further present: That William Conley and James R. Wilson, each late of the ward, city and county aforesaid, at the ward, city and county aforesaid, before the said felony and receiving stolen goods so as committed in form aforesaid, on the fifth day of January, in the year last aforesaid, did feloniously, willfully and maliciously incite, move, procure, aid, counsel, hire and command the said Charles Wills the said felony and receiving stolen goods, in manner and form aforesaid, to do and commit, against the form of the statute in such case made and provided, and against the

peace of the people of the State of New-York and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present: That afterwards, to wit, on the day and in the year last aforesaid, the said William Conley, late of the ward, city and county aforesaid, with force and arms, at the ward, city and county aforesaid, fifty veils of the value of five dollars each, fifty shirts of the value of five dollars each, fifty collars of the value of five dollars each, fifty pieces of edging of the value of five dollars each, fifty pieces of inserting of the value of five dollars each, fifty robes of the value of five dollars each, fifty waists of the value of five dollars each, of the goods and chattels of one Aaron G. Crane, by some person to the jurors aforesaid unknown, then lately before feloniously stolen of the said Aaron G. Crane, unlawfully, unjustly and for the sake of wicked gain, did feloniously and willfully receive and have; the said William Conley, then and there well knowing the said goods and chattels to have been feloniously stolen.

And the jurors aforesaid, upon their oath aforesaid, do further present: That Charles Wills and James R. Wilson, each late of the ward, city and county aforesaid, before the said felony and receiving stolen goods was committed in form aforesaid, to wit, on the fifth day of January, in the year aforesaid, at the ward, city and county aforesaid, did feloniously, willfully and maliciously incite, move, procure, aid, counsel, hire and command the said James R. Wilson the said felony and receiving stolen goods, in manner and form aforesaid, to do and commit, against the form of the statute in such case made and provided, and against the peace of the people of the State of New-York and their dignity.

And the jurors aforesaid, upon their oath aforesaid, do further present: That afterwards, to wit, on the day and in the year last aforesaid, the said James R. Wilson, late of the ward, city and county aforesaid, with force and arms,

Wills and Conley v. The People.

at the ward, city and county aforesaid, fifty veils of the value of five dollars each, fifty shirts of the value of five dollars each, fifty collars of the value of five dollars each, fifty pieces of edging of the value of five dollars each, fifty pieces of inserting of the value of five dollars each, fifty robes of the value of five dollars each, fifty waists of the value of five dollars each, of the goods and chattels of Aaron G. Crane, by some person to the jurors unknown, then lately before feloniously stolen of the said Aaron G. Crane, unlawfully, unjustly and for the sake of wicked gain, did feloniously and willfully receive and have; the said James R. Wilson then and there well knowing the said goods and chattels to have been feloniously stolen.

And the jurors aforesaid, upon their oath aforesaid, do further present: That Charles Wills and William Conley, each late of the ward, city and county aforesaid, before the said felony and receiving stolen goods was committed in form aforesaid, to wit, on the fifth day of January, in the year last aforesaid, at the ward, city and county aforesaid, did feloniously, willfully and maliciously incite, move, procure, aid, counsel, hire and command the said James R. Wilson the said felony and receiving stolen goods, in manner and form aforesaid, to do and commit, against the form of the statute in such case made and provided, and against the peace of the people of the State of New-York and their dignity.

A. OAKEY HALL,<br>
<i>District Attorney.</i>

The defendants, Wills and Conley, having been arrested, pleaded not guilty, and the cause came on to be tried, as against them, on the 8th December, 1856, before Elisha S. Capron, City Judge.

*Aaron G. Crane* was called and sworn as a witness for the prosecution, and testified as follows: I am of the firm of Crane & Struthers; we are importers of lace goods and

embroideries; we do business at No. 177 Broadway; on the morning of January fifth a burglary was committed at our store; I found that our whole premises, consisting of three lofts, were all in disorder, and a large amount of goods stolen; they consisted of jaconet collars, infants' robes, infants' waists, embroidered habit shirts, needlework trimmings, black lace veils, blonde lace edgings, also some colored goods, and the whole valued at from $6000 to $7000; another firm occupy part of the premises; sometimes their porter gets to the store before ours, and in that case he opens the door; I cannot say which porter opened the door that morning; we recovered part of the stolen property, and have about $2500 worth of it now in our possession; we recovered a portion of all the goods stolen; it was on January eighteenth that I saw those goods in two black trunks and a black bag; I immediately recognized them by our private mark; I saw them at Mr. Samuel Emberson's house, in Eighth-avenue; he was present when I saw them.

*Cross-examined.* The private marks were on the goods when I saw them at Emberson's; the name of the firm did not occur on the tickets; I have not the letter or a copy of the letter which I wrote to Mr. Emberson; I remember the contents of it.

*Samuel Emberson* was next called and sworn as a witness for the prosecution, and testified as follows, viz.: I do business at No. 285 Eighth-avenue; I am a dealer in lace goods and embroideries; I know Wills and Conley; they did business last January at No. 333 Broadway, corner of Worth-street; they occupied three rooms; two rooms on a line, as you enter, and one at the back of the office; I was in their office on January tenth, in the afternoon; I saw Wills and Conley there; Wills beckoned me to come into the private office; I went in and he locked the door; he asked me if I would buy goods that were "pulled" or "drawn;" I asked him what he meant by "pulled" or "drawn;" he said he would be plain with me, he meant goods that were stolen;

I said I was surprised at him, and asked him if he thought I would buy stolen goods; then I asked him what kind of goods they were; he pulled a memorandum from his vest pocket and told me what they were; he read a description of the goods: blonde laces, infants' robes, infants' waists, black lace veils, and brown and blue goods; he asked me if I saw the *Herald* of Sunday; I told him no; he told me to go home and read the *Herald* of Sunday; I saw an advertisement there relating to stolen goods; I saw Wills and Conley the next morning; I would now know a man called Wilson, but I did not know him then; I first saw him at the Tombs; I saw Wills and Conley, the morning after I had seen the *Herald*, at their office; Wills asked me if I had seen the *Herald;* I said I had; I asked him for a sample of those goods; he asked me if I would buy them; I told him there would be no harm in looking at a sample; he asked me if I had any business down town; I told him yes; he said if I would come in at twelve o'clock he would show me samples of the goods; I told him I was going to auction; I returned to Wills a little after eleven o'clock; I saw Wills and Conley; I asked again to see samples of the goods; he sent Conley after them; he told Conley to be careful that any one was not watching; he was gone about fifteen minutes; he then came in with samples buttoned up inside of his coat; he went into a private room and left them there; Wills and I went in and examined them; he locked the door; they consisted of veils, chemisettes, waists and blonde laces; they had no marks on them; he wanted me to give an offer for them; I told him I did not like to buy goods in that way; I insisted on seeing the whole lot of goods; he said there was $6000 or $7000 worth of them; he said he would not let God Almighty see them; he said if I bought them I would make money from them, for I could buy the whole lot for from $2000 to $3000; I persisted in seeing the whole lot of goods, for I would not buy a pig in a sack; he then said he would let me see them the next day, and I made the appoint-

ment to meet him : I saw Wills the next morning, at the office ; I do not remember if Conley was there ; he could not let me see the goods, but appointed Monday following for the day when I could see them, as he had not yet made his arrangements , I appointed to meet him on Monday, and I went to him ; he made an appointment with me at noon on that day to go and see the goods ; he said there was a warrant out for him and Conley, but it was not of much importance, and would be settled in an hour ; he said he was going to get bail ; I returned at noon, but found they were locked up in the Tombs ; I saw them the next day at the Tombs ; I asked them if I could do anything for them ; I asked Wills if he could let me see those goods ; he said he would be out on bail that day, and he would show them to me ; I left them then, and saw them next morning in the Tombs again ; there was one person in to see them when I first went there ; when he came out I went in ; I told Wills to give me an order to see the goods ; he told me I ought not to allude to the affair, even to my wife ; he asked me why I had spoken to any one outside about it ; he alluded to Wilson ; I replied that if Wilson did not know anything, he could not tell anything about it from what I said ; I insisted on getting the order from Mr. Wills ; he gave me au order to see them ; this paper now shown to me is the order ; it reads, " This is the person ;" signed, " Charles Wills ;" I showed the order to Wilson ; it was not directed to anybody ; I came out of the prison when I got the order ; I had a conversation with Wilson outside the prison ; I saw Wilson again that morning ; I understand Wilson keeps the " Shades," in Greene-street ; I went to Leonard-street with Wilson, afterwards to the Court of Sessions, and afterwards to the Williamsburgh ferry ; I went alone and saw Wills going on board the boat and beckoning me to come on ; we went to Williamsburgh ; he shook his head to prevent my speaking to him ; I saw Wills talk to another man on the boat ; I asked him afterwards who the man was and he said

Wills and Conley *v.* The People.

he was a horse doctor; I went to Lee-avenue, near Ross-street; I there saw a woman in the basement; Wills asked her for a light; we proceeded up stairs, and he took me into the parlor; he opened a door at the head of the stairs and brought out two trunks and a black bag; I helped to haul the trunks into the parlor: they were locked, and he told me that Wilson would be there with the keys in a few minutes; I waited for him; in about ten or fifteen minutes Wilson came; I first saw Wilson when I was waiting to go into the Tombs to see Wills' and Conley; I asked Wilson then if he was a friend of Wills and Conley; he said he was, and asked me if I was; I replied that I knew Wills and was anxious to get them both out of the Tombs, as I was buying a large lot of goods of them; he said I might not be alarmed, as the goods were all right; he said if I could get an order from Wills that I was the right person he could sell them to me as well as they could; he said he had the keys of them in his pocket; he then went in to see the prisoners; when he came out he told me to go in and get the order from Wills, and he would wait; I went in and had the conversation with Wills that I testified to above; I showed Wilson the order Wills gave me, and he made an appointment to meet me; I afterwards saw him in Leonard-street and accompanied him to the Court of Sessions, when he appointed to go with me and see the goods; he told me to go to the Peck-slip ferry; when I went there I saw Wills as I stated, and went with him to the house; when Wilson came he unlocked the trunks, and said if I would buy the goods he would bring them to the ferry, but would not take them across; Wills took a piece of paper and made a memorandum of the goods while I counted them over; Wilson laid on the floor and watched me to see if I counted straight; I never saw the memorandum since; I had a memorandum of the goods which had been stolen from Mr. Crane.

*Question.* From whom did you receive the memorandum?

. This was objected to by the prisoners' counsel, as incompetent and irrelevant, but allowed by the court; and to the decision of the court in that behalf the prisoners' counsel excepted.

*Answer.* I procured the memorandum from Mr. Crane.

*Question.* When did you procure it from Mr. Crane.

(Like objection, decision and exception as last above.)

*Answer.* I got it one or two days before I went to Williamsburgh; I procured the memorandum from Mr. Crane; I saw that all the missing goods were not there; they told me they were not all there, but that I could have them all; I made up my mind to buy that portion of the goods; I either got a copy of the memorandum Wills made, or took one; I asked him what he wanted for the goods; Wilson said they were worth $5000; I said they were not, as I knew as much about their value as he did; he said he had been in the store where they came from, and priced them; he said he had also asked the value of such goods in the stores in Broadway, and found they were very expensive; we then left, Wills, Wilson and myself; they said if I would buy that portion of the goods, they would give me the rest the same night; on coming down to the ferry, Wilson asked us to go into a place and drink; we did so, and then went over the ferry to Grand-street; all the time I was bargaining for the goods; we separated at the "Shades," in Crosby-street, kept by a man named Stuart; I made an appointment with Wills to go the next day and see the rest of the goods; I saw Wills next day at Peck-slip ferry; we crossed over to Williamsburgh; I went to a livery stable and got a hack to convey the goods from the house in Lee-avenue; I paid $2000 to Wills, $1800 in bills and the rest by a check; I conveyed the goods to my premises in Eighth-avenue; Wills left the carriage in Second-avenue; I marked the bills I. and T.; they were $100 bills; Wills said he would have nothing to do with checks in such a transaction; I told him the bank was not open, and the $1800 were all the broker had

from whom I got the money; I succeeded in getting him to take the $200 check; the check now shown me is the one he took; that is Wills' indorsement.

The check is as follows:

" *No.* .                    NEW-YORK, *January* 18, 1856.

New-York County Bank, corner of 14th-st. and 8th-avenue: Pay to C. Wills or order two hundred dollars.

" $200.                    SAMUEL EMBERSON."

(Indorsed) " C. WILLS."

*Question.* Where did you get the $2000?

This was objected to by the prisoners' counsel, as incompetent and irrelevant, but allowed by the court; and to the decision of the court in that behalf the prisoners' counsel excepted.

*Answer.* I got the $2000 from Mr. Crane; that is to say, Mr. Crane gave me a check for $2000, and I used that money to buy the goods; Mr. Crane came to my house to see the goods; I subsequently sent them to Mr. Crane; I saw Wills the evening I bought the goods; the balance of the goods were to be delivered that night at my store; I waited for them; Wills came and said that the party who owned the other goods was in the country, and he could not get them that night; the next day he said the party had not returned, but he would try and get the goods for me; I saw him often afterwards; I did not see Wilson afterwards.

This witness was cross-examined at length, but no question arose for decision on the cross-examination.

After Ann Crosby had been examined by the prosecution, *Samuel Emberson* was recalled for the prosecution and further examined.

On his further *cross-examination*, he reaffirmed in substance all that he had sworn to on his first direct examination; he stated the additional fact that when Wills sent Conley for the samples, as he had testified, he told him to be careful

if. Pincus was watching him; he admitted that he had borrowed money of Mr. Crane, and had repaid it with interest; also, that he had purchased goods of Mr. Crane, and had paid for them; also, that he owed Mr. Crane for goods at the present time, but that the time for payment had not arrived.

He testified further as follows: I don't know Mr. Maeder; I remember meeting Wills in April last, and telling him the case was coming on; I remember meeting Wills on the Eighth-avenue, and telling him the trial was coming on; it was about ten o'clock at night; it was just after I closed my store for the night; Wills was frequently lounging round my store, and always wanted to talk with me; there was a person with him on this occasion; I don't remember taking Wills aside and talking with him; I don't remember particularly anything I said; Wills did not say to me, as he turned around from me, after holding any conversation with me, "I would not give three cents to settle the matter; I wish to have the case fully investigated," or anything to that purport or effect.

After several other witnesses had been examined by the district attorney, the evidence on the part of the prosecution was closed.

The counsel for the prisoners then moved the court to order that the defendant, William Conley, be discharged from the indictment, it appearing that there was not sufficient evidence to put that defendant on his defence; that the evidence of Samuel Emberson, which was all there was against that defendant, did not make out a case against him.

The court overruled the motion, and refused to order the discharge of the last name'd defendant from the indictment; and to its decision and refusal in that behalf the counsel for the last mentioned defendant excepted.

The counsel for the prisoners then moved the court to dismiss the case, or to direct the jury to acquit the prisoners, because of a want of jurisdiction on the part of the court;

Wills and Conley *v.* The People.

it not appearing that the prisoners, or either of them, felo-
niously or otherwise, bought or received, in any manner
upon any consideration, the property of Mr. Crane, or Crane
& Struthers, or any part of such property, within the city
and county of New-York.

The court overruled the motion, and to its decision the
counsel for the prisoners excepted.

The counsel for the prisoners then opened the case to the
jury.

After other testimony, *Augustus H. Maeder* was called as
a witness for the prisoners (Wills and Conley), and being
duly sworn, testified as follows, viz. : I am a dentist; I carry
on business at No. 333 Broadway; the next room to Wills'
office; I have been in business there four years; I know
Wills and Conley; I have known them since they occupied
the office next to me; I was in Wills' office in January last;
in the second week of January, before or about the middle
of the week; I was in his office weighing gold; I was using
their scales; it was in the morning; while I was there, a gen-
tleman came in with some samples of goods; the goods con-
sisted of bosoms, collars and dark veils; there were embroi-
dered collars; the laces were embroidered; there were some
baby waists; the veils were black; the man who brought
them in said he wanted to raise two thousand dollars on
them; Wills requested him to leave the samples, and call in
the afternoon; the goods were brought in a box, in brown
paper; I cannot tell how large a box; about twelve or
eighteen inches long, and shallow; not deep; I think all
the samples were in one box; he produced a list, and told
Wills how many he had.

*Question.* Did he say anything as to the manner in which
he became possessed of the property; and if so, what did
he say?

Question objected to by the district attorney, and excluded
by the court; and to the decision of the court in that behalf,
the counsel for the prisoners excepted.

*Question.* Did he say anything as to what the portion of the property not exhibited consisted of; and if so, what did he say?

Like objection, decision and exception.

*Question.* Can you remember any other conversation between the man and Wills at this time, than you have already stated?

Like objection, decision and exception.

*Question.* Were you in the office at the time Wills and the man were there together?

Like objection, decision and exception.

The witness proceeded: I saw Samuel Emberson and Wills together on the Eighth-avenue; it was pleasant weather, in the evening, between nine and ten o'clock; it was between Twentieth and Thirtieth streets; I was with Wills, and another friend of his was along; Emberson met us in the Eighth-avenue; I think he was walking in the same direction with us, and overtook us; he called Wills aside, and they conversed together; I did not hear the conversation between them.

*Question.* Did you hear what was said between them, or any part of it, as Wills turned round to leave Emberson? and if so, state what you heard.

This question was objected to, by the district attorney, as incompetent, and excluded by the court; and to the decision of the court in that behalf the counsel for the prisoners excepted.

The district attorney then asked the counsel for the prisoners what they proposed proving by the last question? The counsel for the prisoners replied, that they proposed showing, by way of contradicting Samuel Emberson, that in this conversation Wills made use of this language to Emberson: "I would not give three cents to settle the matter; I wish to have the case fully investigated;" or to that purport.

The district attorney objected to proof of the last men-- tioned facts, as stated ·by the counsel for the prisoners, and the court excluded the proposed proof, and refused to allow it; and to the decision of the court in that behalf the counsel for the prisoners excepted.

*John Pincus* was next called as a witness for the prisoners (Wills and Conley), and being duly sworn, testified as follows : I am a commission merchant, at 88 Cedar-street, in this city; I have been in business for five years; I have known Wills and Conley for about two years; I have been in their place of business; I was there in January last; it was on the tenth or eleventh of January, between nine and ten o'clock in the morning; I saw a bundle of samples lying on the top of the iron safe; the safe stood opposite me as I entered; Wills showed them to me, on the counter; they were in a box, in a brown paper; there were collars, veils, ladies' chemises, laces and other goods; I passed no value upon them.

*Question.* Was anything said by Wills as to what the property was doing there?

This question was objected to by the district attorney, and excluded by the court; and to the decision of the court in that behalf the counsel for the prisoners excepted.

After the examination of several other witnesses on the part of the prisoners, Wills and Conley,

*John Sedgwick* was called as a witness in their behalf, and testified as follows, viz. : I am assistant district attorney of this county; I drew the indictment in this case; I got the description of the property set out in the indictment from Mr. Crane; I cannot specify any source from which I obtained it; I think prior to the making of the affidavit on which the prisoners were arrested, I had a list of the articles stolen from Mr. Crane, given me by himself; I think the description of the property in the indictment was taken from that list.

The prisoners' counsel offered to show, as a circumstance discrediting Samuel Emberson, that for four terms or more preceding their trial, the prisoners had been ready, and had moved the court to bring on the trial of the indictment, and that the delay was owing to the prosecution; and that at the last term of the court, the recorder stated that he considered it a hard case, and that if it came before him again on a similar application, or under similar circumstances, he would feel bound to interfere for their relief.

The district attorney objected to the offered proof of the facts last mentioned, and the court refused to allow any proof thereof; and to the decision of the court in that behalf the counsel for the prisoners excepted.

After the evidence closed, the counsel for the prisoners renewed the motion to the court, heretofore made on behalf of the defendant William Conley, namely, for an order that he be discharged from the indictment, on the grounds herein already stated, and upon the additional ground that the case for the prosecution having closed, and the testimony disclosing nothing further against that defendant, the court could pass upon the motion with the whole case before it.

This motion was renewed, on behalf of each of the prisoners, separately and distinctly, and was overruled by the court in relation to both and each of them; and to the decision of the court in that behalf the counsel for the prisoners excepted, on behalf of both and each of the prisoners.

The case having been summed up to the jury, the counsel for the prisoners requested the court to instruct the jury upon the following propositions, viz.:

1. If the jury believe that the defendants first bought or in any way received the last mentioned property (*i. e.*, the property described in the indictment), in Williamsburgh, Kings county, and that after that they brought into and exposed for sale, in the county of New-York, the last mentioned pro-

perty, or any part of it, they cannot be convicted under the present indictment.

2. That the testimony of Samuel Emberson as to Wills sending Conley out for the patterns or specimens, and what then passed, is not sufficient, of itself or by itself, to justify the conviction of Conley.

The court refused so to charge, and to such refusal the counsel for the prisoners excepted.

The jury found both the defendants guilty, and they were sentenced to imprisonment in the state prison for four years and eight months. A writ of error was then sued out in their behalf.

*John Graham*, for the prisoners.

I. The question to the witness Emberson, as to the person from whom he received the memorandum of the goods stolen from Crane & Struthers, was improperly allowed by the court to be put by the prosecuting counsel. This was a memorandum which Emberson alleged he had with him when examining certain property, which he swore Wills showed him at Williamsburgh. The evidence related to a transaction in the absence of the accused. With reference to them it was *res inter alios acta.* Besides, it was allowing the witness to support his testimony in a way in which the guiltiest person could always make evidence in his favor. All that a guilty person has to do do, within this ruling, to screen himself from suspicion, when his interference with the property of another is criminal, is to treat with the owner, and profess to act under and for him, and the end is gained. If called as a witness to fasten guilt upon another who may be innocent, this fact is to corroborate his evidence and place it above all question. In other words, a witness may show that he is not *particeps criminis* by evidence which is not available to the party accused, and thus manufacture

PAR.—VOL. III.     62

himself his own corroboration. The position of the witness will be fully appreciated, when it is considered that he was not only making out a case against the accused, but, in so doing, was destroying what, without his explanations, was a conclusive case against himself. The evidence was certainly not *german* to the issue. That was as to the guilt or innocence of the accused. The witness had not been assailed at this time by any evidence calculated to impeach the motive of his conduct. The necessity of supporting him was felt, and was anticipated; which was beyond all rules or reason.

II. The principle of the last point is applicable to the other exceptions where questions were allowed by the court, still further exhibiting the connection of the witness with Mr. Crane, one of the prosecutors.

III. The court below erred in refusing to order that William Conley, one of the plaintiffs in error, be discharged from the indictment at the close of the case for the prosecution, in the first instance. All the evidence against Conley was given by Emberson. The motion was made in pursuance of 2 *R. S.* (735, § 21.) It will be observed that the statute does not refer merely to a case in which there is no evidence to put a party on his defence; but cases where, though there may be some, there is not sufficient evidence for that purpose. The order of discharge can be made by the court without the interference of the jury. If Conley was entitled to his discharge the error in not ordering it affected both him and Wills. He could have been a witness for the latter, and in that way have materially aided his defence. Believing all Emberson swore to, and supposing it to place Wills' guilt beyond all doubt, still it showed no participation on the part of Conley. On the contrary, Wills never permitted him to be present at a single interview between himself and Emberson. Where a combination or conspiracy is charged, evidence, which should have been allowed as to any conspirator, if disallowed, will form

a good ground of exception as to all. ( *Barthelemy* v. *The People*, 2 *Hill*, 248, 253, 259.)

IV. The court below erred in refusing to dismiss the case or to direct an acquittal.  In the indictment it was alleged that the accused received and had.   As receiving and having are, within the view of the prosecution, as will be hereafter seen, separate offences (2 *R. S.*, 726, § 43 ), unless the copulative " and" makes " having" synonymous with " receiving," each count of the indictment would be bad for embracing two offences.   The mode of connecting or associating the words show that the pleader meant to charge the receiving to be the offence.   If the indictment had said " received or had," it might have been different, but still liable to the objection of two offences in one count.   When the prosecution rested, there was no evidence to show that the identity of any property which Emberson swore he saw at the loan office was that of the prosecutors, beyond Wills' admission that it was a part of the stolen property, made in the absence of Conley.   Certainly as to Conley this was not the least evidence ; and as to Wills, as the identity of the property was a part of the *corpus delicti*, his simple admission would not prove it as to him. ( *The People* v. *Hennessy*, 15 *Wend.*, 147 ; *The People* v. *Badgley*, 16 *id.*, 53.)   If the having the property is made an offence, it does not warrant the presumption that the receiving took place where the parties had the property.   If this is not so, why should the statute use the words, " received or had?" (2 *R. S.*, 726, § 43.)

V. The court below erred in excluding the questions to the witness Maeder. ( *Mezzara's case*, 2 *City Hall Recorder*, 113 ; *Atwood's case*, 4 *id.*, 91 ; *Robetaille's cases*, 5 *id.*, 171, 173 ; *United States* v. *Craig*, 4 *Wash. C. C. R.*, 729 ; *Mitchum* v. *The State*, 11 *Geo. R.*, 615 ; *Rex* v. *Whitehead*, 1 *Carr. & Payne*, 67 ; *Rex* v. *Crutchley*, 5 *id.*, 133 ; *Powell* v. *Harper*, 5 *id.*, 590 ; *Hayslep* v. *Gymer*, 1 *Adolph. & El.*, 162.)

VI. The court below erred in excluding the question to the witness Maeder, as to whether the defendant Wills made the remark to Samuel Emberson, at the close of the conversation with him, as there inquired after. The court manifestly deemed the evidence proposed incompetent, and refused to allow proof of the fact, from this or any other witness. The attention of Emberson had been properly called to the matter; and the decision of the court can only be sustained upon the ground that the attempt was to contradict as to purely collateral matter. (*Lawrence* v. *Barker*, 5 *Wend.*, 301; 2 *Phil. Ev.*, 726, *Cow. & Hill's ed.*, 1843; *The People* v. *Austin*, 1 *Park. Cr. R.*, 157.) For correct instances of collateral matter, see *Lawrence* v. *Barker* (5 *Wend.*, 301), *Harris* v. *Wilson* (7 *id.*, 57). In determining whether the question excluded affected collateral matter only, the court is to decide upon the legal effect of what Emberson had sworn to. In saying that Wills was loitering around his place of business, trying to speak with him, and in denying that Wills made use of the language suggested, did he not virtually swear that Wills all along admitted his guilt? Was not this the impression he must have conveyed to the jury? Was it not vital to the defence to show that, on this occasion, Wills indulged in a manner and language directly inconsistent with what Emberson had sworn he indulged in, when he placed Wills alone with himself in his (W.'s) office, and other places, when and where he could make him speak and act as his (E.'s) feelings might induce him to swear he did? This is as strong a case as *Patchin* v. *Astor Mutual Insurance Company* (3 *Kern.*, 268). Had the question excluded been put and answered, it would not only have impeached the feature of Emberson's testimony specifically aimed at, but it would have affected, more or less, his entire evidence in chief. Another view, establishing the error of the court below, is, that Emberson's evidence in this particular, if false, must have been conceived and manufactured in a spirit of hostility — unfriendliness. The rule on this point is, that

whatever tends to prove the unfriendly feelings of the witness towards the party against whom he is testifying, is competent. (*Starks* v. *The People,* 5 *Denio,* 108; *Newton* v. *Harris,* 2 *Seld.,* 345.) Another view is this: If the testimony of Emberson, in the particular adverted to, is false, it would be material within the rule regulating indictments for perjury. " Every question on cross-examination which goes to the credit of the witness is material. (*Reg.* v. *Overton,* 1 *Carr. & Marsh,* 655.)

VII. The court below erred in excluding the question to the witness Pincus. The object of this evidence was to show that Wills was endeavoring to sell the property in pursuance of instructions, and that he gave an account of the manner in which he became possessed of it, tallying with what Maeder had partially sworn to, and would have fully sworn to if allowed by the court. It disproved secrecy — concealment on the part of Wills — and established a mere business connection with the property.

VIII. The offer to show that the plaintiffs in error had endeavored to force on their trial was improperly overruled.

IX. The court below improperly overruled the motion for the discharge of Conley, at the close of the evidence on both sides.

X. The court below erred in refusing to charge that if the property embraced in the indictment, or any part of it, was received feloniously in another county, and subsequently brought into this county by the defendants, no conviction could take place under the indictment; and in charging that, under such circumstances, a conviction could take place. This request went to the jurisdiction of the court. 2 *Revised Statutes* (*p.* 697, § 1) defines the jurisdiction of the several courts of this state over crimes. For the more efficacious distribution of government, the principal civil division of the state is into counties. (1 *id.,* 83, § 1.) The judicial arrangements of these counties, as are the other branches of their economy, are carefully prescribed by

statute, and it is through them the criminal laws of the state are applied and enforced. It may be observed, as a general rule, that offences against public law, although the property of the people of the whole state, are nevertheless to be tried and punished by the courts of the counties within whose limits they occur or are committed; in other words, jurisdiction is local. This was so at common law. (1 *Trials per Pais*, 125.) Moreover, at common law, the jury came from the "neighborhood, or place near at hand, or neighbor place where the question (rose) about (which) the fact is (was) moved (*id.*, 115): that is, jurors were summoned from the place, where they may have the better and more certain knowledge of the fact." (*Id.*) *Visne* or *venue* was used in a twofold sense: First. In reference to the jurisdiction of the court; Second. In reference to the place from which the jury were to come. (2 *Bouv. L. Dic.*, "*Venue*," "*Visne.*") Our statutes proceed upon the principle of the locality of jurisdiction. The only difference is that, under the statutes, a county is a greater extent of territory than the *vicinetum* of the old law, and juries now are summoned *de corpore comitatus*. (*The People* v. *Hulse*, 3 *Hill*, 309; *Manley* v. *The People*, 3 *Seld.*, 295; *The People* v. *Allen*, 5 *Denio*, 76.) Courts of General Sessions are local courts, in the strictest sense of that term; and as they are of statutory creation, can exercise no powers not clearly conferred or given. Their jurisdiction is conferred at 2 *Revised Statutes* (*p.* 208, 209, § 5). By the first subdivision, they are " *to inquire of all crimes and misdemeonors committed or triable in such county.*" Triable is used in contradistinction to committed, and means crimes which, although actually committed in one county, are constructively committed in every county through which the proceeds of the crime are carried. (2 *id.*, 727, § 50.) By the second subdivision, these courts are " to hear, determine and punish " all such crimes as do not produce death to the offender, or imprisonment in the state prison for life. The jurisdiction of the New-York General Sessions (the court

below) has been since extended to crimes causing these consequences. (*Laws of* 1855, 613, § 1.)   If having stolen property in one county, when it was actually received in another, is a distinct offence, the indictment should have alleged that offence specifically.   It becomes a statutory offence, and should have been alleged, as all statutory offences are required to be, substantially in the terms of the statute.   If the property in question was feloniously received in Kings county, and then brought into this county, the offence here was having it here, and for that the plaintiffs in error should have been indicted.   That was the offence triable in the court below.

XI. The court below erred in refusing to charge the jury that a particular part of Emberson's evidence was not sufficient, of itself or by itself, to justify the conviction of Conley ; and in charging the jury that it was sufficient.

XII. If the judgment is reversed as to either of the plaintiffs in error, it must be as to both. (2 *R. S.*, 736, § 21 ; *Grah. Pr.*, 960, *2d ed.*)   This seems to be the rule where the reversal takes place on bill of exceptions. (*Story* v. *The N. Y. and Harlem R. R. Co.*, 2 *Seld.*, 85.)

*A. Oakey Hall* (District Attorney), for the people.

I. The court properly admitted the two specific facts, that Emberson, the witness, received a memarandum of missing goods from the owner, and at a time prior to buying the goods of defendants, because these connected Emberson as the agent of the complainants, and were links to show that his dealings with defendants were not those of a guilty accomplice.   A jury are entitled to know at the outset what agency, guilty or innocent, a witness has. (1 *Greenl. Ev.*, 382.)

II. The same may be said of the next exception. (6 *Metc.*, 221.)

III. The only construction which can be given to the statute making it the duty of a judge to order a discharge from the record of one defendant against whom there is insufficient evidence is, that the matter is in the discretion of the court, to which no exception lies.

IV. There was jurisdiction in the county of New-York, the evidence of Emberson being that the transaction originated in New-York, where the goods first were seen. They were next in Williamsburgh, and again in New-York. Now, the offence is not the selling to the witness, but the receiving and having before. If, therefore, the jury believed that the goods seen primarily in New-York were stolen goods, the crime then and there attached, however afterward, in pursuance of a proposed sale, they were, on prisoners' security, moved about.

V. The point raised on Maeder's evidence is already *res adjudicata* in this court, in the case of *Rando*, and the law is for the prosecution. ( *MS., dec. at Feb. Gen. Term.*)

VI. The court properly excluded the naked declarations of Wills in the course of a conversation about which the prosecution did not offer evidence. They were inadmissible in any aspect.

VII. The naked declarations of Wills were properly excluded, under law of *The People* v. *Wiley* ( 3 *Hill*, 194 ). It was emphatically a declaration of innocence in advance of a charge.

VIII. The court properly refused to interfere with the province of the jury, and instruct it whether evidence was or was not sufficient.

*By the Court,* MITCHELL, J.—The plaintiffs in error were indicted and found guilty of feloniously receiving and having, in the city of New-York, certain goods knowing that they were stolen. Crane, the owner of the goods, proved that they were stolen, and that he found them afterwards at the house of S. Emberson, the principal witness in the cause.

This alone might lead to the impression that Emberson was an accomplice in the stealing; it might be, however, that he had been employed by Crane to discover and obtain the property. It was proper, therefore, to prove how he became connected with the business, and Emberson was therefore properly allowed to testify that he had, when he went to Wills' office or store, a memorandum of the goods and that he had procured it from Mr. Crane one or two days before he went to Williamsburgh for the goods, and that when he bought the goods of the prisoners he paid them $2000, which money he got in a check from Mr. Crane. Crane also testified that he had written a letter to Emberson. This evidence shows that Emberson, instead of being the accomplice of the prisoners, was the agent of the owner of the goods, aiding him to recover them. His testimony, for this reason, is admissible without corroboration.

A motion was made to the court to discharge Conley, on the assumption that there was no proof against him. It is too clear for dispute, that there was evidence to justify the jury in convicting Wills. Wills and Conley were in the same store, at the corner of Broadway and Worth-street, consisting of two rooms in a line, and a back or private office. Both were there on the tenth of January, when Emberson was there, and on the eleventh. The first day Wills took Emberson into the back office and asked him if he would buy stolen goods. It does not appear that Wills took Emberson to the back office on the second day, and it does appear that Emberson saw Conley as well as Wills at the store on that day, on two occasions; first, as he was going down town, and afterwards, on his return, at eleven, A. M., and it would seem that Conley was present at all the conversation on this day, when Wills asked Emberson if he would buy, and said he would show samples of them; the witness, speaking of his return to the store a little after eleven o'clock, says: "I saw Wills and Conley; I asked again to see samples of the goods; he" (Wills) "sent Conley after

them ; he told Conley to be careful that any one was not watching; he" (Conley) "was gone about fifteen minutes; he then came in with samples buttoned up inside of his coat; he" (Conley) "went into a private room, and left them there ; Wills and I went in and examined them ; he locked the door." Emberson, on cross-examination, said "that when Wills sent Conley for the samples, he told him to be careful if Pincus was watching him." The locking of the door, the direction to Conley to be careful that any one was not watching; to be careful if Pincus was watching him, although acts of Wills, were done, the first in the presence of Conley, and the others in speaking to him, and showed to him that the transaction was one that needed concealment, and was probably criminal. His acting under such orders, and his concealing the samples by buttoning them inside of his coat, and taking them into the private office, were strong evidence that he knew the business of his employer, and that the goods were to be concealed, and that he was to be careful that he was not watched, because they had been stolen. Secrecy and concealment have always been evidences of consciousness of guilt. In addition to this, Conley, when searched, had on him this memorandum, which corresponded in general description with the stolen goods, although one of them contained some articles in addition ; and Pincus, in his testimony for the defence, speaks (as Emberson did in substance, for the prosecution) of the store as "their place of business," after saying he had known Wills and Conley for about two years. The motion to discharge Conley was properly denied.

A motion to dismiss the case, on the ground that it did not appear that either of the prisoners bought or received any of the property within the city of New York, was also properly overruled. The samples were received by Wills here from Conley, after Conley had been absent but fifteen minutes to get them ; that was evidence that he did not get them from Williamsburgh, but within the county of New

York; and although the bulk of the articles was then in Williamsburgh, it was very probable that all were received here, and the bulk removed there for concealment, until the contrary should be proved. In this city was the prisoners' store, where they transacted their business in form, in loaning money on goods pledged. The house in Williamsburgh was only a place, apparently, for storing and concealing the goods.

On behalf of the prisoners, a witness was allowed to testify that he was at Wills' store about the middle of the second week in January, when a man came in with samples of goods, consisting of bosoms, embroidered collars, and dark or black veils and babies' waists, and said he wanted to raise two thousand dollars on them. The court refused to allow him to answer the question, "Did he say anything as to the manner in which he became possessed of the property; and if so, what did he say?" In the case of .Rando, this court at the February term, by a majority vote, held that a very similar question could not be put. It may well be that where the question is whether, at the time when goods were received, the receiver knew that they were stolen, and the inquiry is merely as to his knowledge, and all that is then done in acts may be proved, that all that is then said, which could have influenced his opinion, may also be proved. But it is deemed most proper not to treat this as an open question here, and to leave it to a higher court to examine.

The prisoners offered to prove that, in a conversation between Wills and S. Emberson on the Eighth-avenue, Wills had said to Emberson that he, Wills, would not give three cents to settle the matter; that he wished to have the case fully investigated. This was offered, not as evidence admissible of itself, but to impeach and contradict Emberson. The declarations of Wills were not evidence of themselves in his behalf; Emberson's testimony, that Wills had not said so, was brought out by the prisoners themselves on

cross-examination by them.  A party cannot cross-examine a witness as to such matter, and then impeach by contradicting him.  The original question was probably inadmissible; if admissible at all, it could be only as a mode of impeaching the witness by collateral matter; and in such case, the party bringing out the first answer must abide by it.  If the question had been as to what Emberson had said, and the thing said was a contradiction of his previous testimony, the rule would be different: as if he had been asked if he had not said that Conley was not in the store when he went there, or that Wills had told him that he had loaned money on the goods, instead of saying, as Emberson testified in his direct examination, that they had been "pulled" or "drawn;" then another witness might be called to show that Conley had said so, not with a view to contradict the cross-examination, but to contradict his testimony on the direct examination, the cross-examination being necessary only to give the witness an opportunity to explain the inconsistency between his testimony under oath and his prior out-door remarks; and, except for this reason, any other person being competent to testify to the contradiction.

The question, "Was anything said by Wills as to what the property was doing at the store, 333 Broadway?" was properly excluded.  It was not the proper mode of showing that he exposed the goods publicly, as is now suggested to have been the object of the question.

The judge was requested to charge the jury, that if they believed that the defendant first bought or in any way received the goods in Kings county, and afterwards brought them into New-York, and there exposed them for sale, they could not be convicted under this indictment.

The statute is, that the receiver of stolen goods "may be indicted, tried and convicted where he received or had such property, notwithstanding such theft was committed in another county." (2 *R. S.*, 726, § 43.)  The revisors' note

The People *v.* Albany County Excise Commissioners.

to this section is: " *New.* In analogy to the rule which allows a prosecution for theft in any county where the stolen goods shall be carried. There is a similar English statute." ( 3 *R. S.*, 844, 845, 2*d ed.* ) The English statute is, that the receiver may be prosecuted "in any county or place in which he shall have, or shall have had, any such property in his possession" ( 2 *Russ. on Cr.*, 238 ), not using the word " received" as our statute does. This shows that the natural meaning of our statute is its true meaning, and that it was intended to allow the trial in any county where the prisoner either received the property at first, or at any time afterwards had it. The words, " or had," are unmeaning without this interpretation.

The judgment should be affirmed.

Judgment affirmed.

Supreme Court. Albany Special Term, June, 1857. Before *Harris,* Justice.